## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSEPH KHIO,              ) | |
| ) | No. 12 CV 7411 |
| Plaintiff,   ) | |
| ) | |
| v.                   ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting   ) | |
| Commissioner, Social Security   ) | |
| Administration,[1]          ) | |
| ) | September 27, 2013 |
| Defendant.   ) | |

## MEMORANDUM OPINION and ORDER

Joseph John Gregory Khio ("Khio") seeks supplemental security income ("SSI") based on his claim that he is unable to work because of bipolar disorder and depression. After the Commissioner of the Social Security Administration denied his application, Khio filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Khio's motion for summary judgment seeking reversal of the Commissioner's final decision. For the following reasons, the motion is granted to the extent that it seeks a remand:

### Procedural History

Khio first applied for SSI on February 13, 2008, but his claim was denied on October 23, 2008. (Administrative Record ("A.R.") 43.) Khio filed a second application on June 22, 2010, claiming that he became unable to work on October 1,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

2007.  (Id. at 43.)  After the Commissioner denied his claim initially and upon reconsideration, (id. at 58, 65), Khio sought a hearing before an administrative law judge ("ALJ"), (id. at 71).  The ALJ held a hearing on August 22, 2011, at which Khio and a vocational expert provided testimony.  (Id. at 16-37.)  On December 30, 2011, the ALJ issued a decision finding that Khio is not disabled within the meaning of the Social Security Act and denying his claim for SSI benefits.  (Id. at 40-51.)  When the Appeals Council denied Khio's request for review, (id. at 1-3), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).  On March 29, 2013, Khio filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g).  The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Khio, who currently is 31 years old, suffers from bipolar disorder.  Khio has been battling this disorder since his early 20s and has been hospitalized as many as eight times over the years, including three times in 2007 and twice in 2011.  As a somewhat younger man, Khio attended two years of college and played semi-professional football.  He also enlisted in the armed forces.  However, all of these plans were derailed, seemingly due in large part to his mental illness.  Between 2004 and 2007, Khio worked a number of jobs, including as a waiter, airport greeter, doorman, and golf caddy, but he has not had any gainful employment since September 2007.  Khio currently is unemployed and lives with various relatives

who help him with his daily living needs. At his hearing Khio presented both documentary and testimonial evidence in support of his claim.

## A. Medical Evidence

The relevant medical record begins in December 2007 when Khio was hospitalized at Advocate Good Shepherd Hospital with the diagnosis of bipolar disorder with mixed, severe, psychotic behavior. (A.R. 251, 447.) Dr. Richard Wagner, who managed Khio's treatment during that hospital stay, identified Khio's non-compliance with outpatient medicine as the precipitating factor leading to his hospitalization. (Id. at 447.) Even during his hospitalization, Khio frequently refused numerous medications and showed poor insight into his illness. (Id. at 447-48.) Khio remained hospitalized for two months and was released in February 2008. In the psychiatric discharge summary, Dr. Wagner stated that Khio was alert and fully oriented, with good hygiene, fair eye contact, no thoughts of harm to himself or others, no psychosis, fair insight, but refusing Abilify on the day of his discharge. (Id. at 446.) His GAF score upon discharge was 50, in contrast to a GAF score of 20 upon admission.[2] (Id.) His diagnosis was listed as "guarded" on account of his lack of insight. (Id. at 448.)

---

[2] The GAF scale ranges from 0 to 100 and is a measure of an individual's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). GAF scores of 11-20 indicate "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *Id.* GAF scores of 21-30 indicate that "[b]ehavior is considerably influenced by delusions or

Khio was hospitalized again for three weeks in August 2008, this time at Adventist Glen Oaks Hospital. (Id. at 493.) Khio had recently been cut from the football team he played for and was deeply depressed over this. (Id. at 494.) He also had stopped taking his Lithium some four to six months earlier. (Id. at 494, 497.) At the time of his admission he displayed depressive and catatonic behaviors. (Id. at 493.) Less than two weeks after his discharge, Khio was readmitted to the same hospital because of threatening behavior and severe confusion. (Id. at 484.) At the time of his admission he was assigned a GAF score of 25-30. He remained hospitalized for an additional week.

Khio received psychiatric care from Dr. Robert Kravets for a number of years until his retirement in 2010. Typically Dr. Kravets saw Khio in 15-minute intervals every two to three months to manage his medications. (Id. at 520-21, 578-80, 582.) Treatment notes from 2007 and 2008 indicate that Khio continued to struggle with accepting his illness and had difficulty taking his medications consistently, leading to numerous decompensations and hospitalizations. (Id. at 521, 580.) By January 2009, Dr. Kravets's notations indicate that Khio had achieved stability on Lithium and Mirtazapine. (Id. at 521.) But three additional notations between May and December 2009 all reflect Khio's reported difficulty with concentration, motivation,

---

hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *Id*. GAF scores of 41-50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*.

stress intolerance, and continued unemployment.  (Id.)  Dr. Kravets's final notation authored on December 12, 2009, states that "[Khio] continues to be very limited in his job skill ability, low concentration and attention span and severe stress intolerance . . . .  He continues at home and is dependent on his family for his care." (Id. at 520.)

Upon Dr. Kravets's retirement, Khio received care from Dr. Beth Fraum. Dr. Fraum's first treatment notation, dated July 6, 2010, indicates that Khio was doing well.  (Id. at 558.)  He denied changes and had no complaints.  (Id.)  However, the following month he reported experiencing severe depression and occasional excessive energy.  (Id.)  Dr. Fraum increased Khio's Lithium dose upon noting that his blood levels for this drug were low.  (Id.)  A notation from August 30, 2010, reflects that Khio felt "unstable," was "teary," and reported having trouble falling asleep.  (Id. at 557.)  Dr. Fraum again adjusted his medication and this seemed to have helped because the following month Khio reported having better sleep and he displayed appropriate mood and affect.  (Id.)  By the next month, Khio reported he was exercising a few times a week and had purposefully lost some weight.  (Id. at 605.)  In late November 2010 Khio reported feeling better and more stable, with more regular sleep patterns and no depression, although he remained poorly motivated.  (Id.)  As of January 2011, Khio was not experiencing any severe problems and was relatively stable.  (Id. at 604.)

Backing up to September 2010, Dr. Gregory Rudolph administered a psychological consultative examination to Khio following a referral by the Bureau of

Developmental and Disabilities Services. At the time of the examination, which lasted 35 minutes, Khio presented with a normal affect, was well-groomed, and had an appropriate mood without evidence of depression or hostility. (Id. at 523.) He understood what was asked of him, and he responded appropriately and coherently. (Id.) Dr. Rudolph concluded that Khio's medications appeared effective in controlling his bipolar disorder, although he presented with some vegetative symptoms. (Id. at 522.) In sum, Dr. Rudolph found Khio to be "capable of managing his own financial resources" and to care for his own basic needs, such as dressing and personal hygiene. (Id. at 522-23.) But he also found Khio's prognosis and insight to be limited. (Id. at 522.)

State examining psychologist Dr. Jerrold Heinrich completed a Psychiatric Review Technique on September 15, 2010, based on the reports of Drs. Kravets, Fraum, and Rudolph. (Id. at 527-39.) Dr. Heinrich affirmed the presence of bipolar disorder and found that Khio suffers a mild limitation as to activities of daily living, moderate limitations as to social functioning, concentration, persistence, or pace, but no evidence of decompensation. (Id. at 537.) In sum, Dr. Heinrich found Khio to be "capable," although with limited insight and prognosis. (Id. at 539.)

Dr. Heinrich also completed a Mental Residual Functional Capacity Assessment. (Id. at 541.) Overall he felt that Khio overstated his inability to manage activities of daily living and thus found Khio only partially credible. (Id. at 543.) He found Khio had adequate understanding, memory, concentration, persistence, and basic social skills, although he lacked the temperament to interact

frequently with others and needed to limit changes in his environment. (Id.) Dr. Heinrich opined that Khio possessed the residual functional capacity ("RFC") to perform simple tasks, subject to the limitations noted. (Id.)

Khio remained stable until March 2011 when he discontinued his medications and exhibited bizarre, manic and aggressive behavior at home, requiring emergency transportation to Lake Forest Hospital. (Id. at 628, 633.) Upon his subsequent transfer to Elgin Mental Health Center a few days later, Khio demonstrated persecutory delusions and disorganized thought processes. (Id. at 630.) A Comprehensive Psychiatric Evaluation completed by Dr. S. Rahmen on March 3, 2011, indicates that Khio was confused, guarded, suspicious, fidgety, at times inappropriate in his responses to questions, poorly modulated, and had a blunted affect. (Id. at 636.) Dr. Rahmen diagnosed Khio with bipolar disorder, type I, with psychosis, and assigned a GAF score of 30. (Id. at 638.) Khio remained hospitalized for three weeks. (Id. at 632.)

Khio discontinued his medications again in July 2011 and had another psychotic episode, this time exhibiting bizarre, inappropriate, and incoherent behavior in a public place. (Id. at 646.) Because of his large size, police transported him to the emergency room in handcuffs. (Id.) He remained incoherent and threatening in the ER, requiring the hospital staff to sedate him. (Id. at 648.) However, by the next day Khio had regained his lucidity and was discharged with the usual reminder to be compliant with his medication. (Id. at 649.) Upon

discharge Khio had a GAF of 60 and was diagnosed with bipolar disorder, type I, with a manic episode and non-compliance with medication.  (Id. at 651.)

Dr. Fraum completed a Mental Disorders—Bipolar—Residual Functional Capacity Questionnaire on August 3, 2011.  (Id. at 643-45.)  She indicated that she began treating Khio on August 3, 2010 (although her first notation in the record is from July 6, 2010), and that she treated him every month or two.  (Id. at 643.)  She found Khio unable to function in a competitive work setting on a full-time basis because "[h]e may not be able to be consistent," is "very moody," and would likely be absent from work about three times a month.  (Id. at 644.)  She also listed depression, episodic psychosis with paranoia, and mental confusion as symptoms affecting Khio's ability to function.  (Id.)  She noted mild restrictions as to activities of daily living, marked difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace.  (Id. at 645.)  Regarding extended episodes of decompensation, Dr. Fraum expected Khio to suffer from three such episodes per year.  (Id.)

B.    **Khio's Hearing Testimony**

Khio stated that he was first diagnosed with bipolar disorder when he was in the army and that he began taking Lithium at that time.  (A.R. 25, 27.)  He testified that because of his illness he will "always have good days and bad days, some worse and some better because of being manic and depressed[,]" and that he has had bad days even when he was fully compliant with his medication.  (Id. at 24-25, 31.)  Khio described a typical "good" day as getting up, having something to eat, showering,

reading, and watching TV. (Id. at 28-29.) On "good" days he may drive to the store or visit family. (Id. at 20-21, 28-29.) Khio stated that he may go out for a drive about three days a week. (Id. at 20.) On "bad" days, he gets up late because he sleeps poorly, and then he does not feel like doing anything and does not function well. (Id. at 29.)

Khio also described his living circumstances over the past year. He does not have any income but has used a Link Card in the past. (Id. at 21.) He lives with family members and depends on them to care for him since he does not have a job. (Id. at 31.) They "nudge" him to take a shower, help him with meals, and help him with the laundry. (Id.) He testified that he was living at home with his mother and stepfather when he suffered a manic episode exacerbated by lack of sleep, and that he "lost it." (Id. at 21.) He wound up being hospitalized for two weeks. (Id.) He then lived with a cousin for some time but once again "went manic," did not sleep, and became delusional. (Id.) His cousin asked him to leave, so he drove to Chicago to live with other relatives but while on his way he became lost and increasingly delusional and wound up being taken to the hospital by the police. (Id. at 22.) Khio maintained that he was taking his Lithium during both episodes. (Id.)

When the ALJ inquired how the manic episodes could occur when he was taking Lithium, Khio responded that "it's more likely that I go manic when I do decrease the dosage." (Id. at 23.) He added that his blood Lithium level during his second 2011 hospitalization was a 2.5, "and that's low but it's not completely not taking it." (Id. at 24.) He also explained that when he is feeling well, he is more

likely to decrease his medications. (Id.) He said that he was in denial of his illness for many years and just wanted to have a normal life. (Id. at 24-25.)

He explained that he refused the recommendation of one of his doctors to go to "partial day hospitalization" because he felt he had educated himself about his disease and did not need this service. (Id. at 27.) He has not applied for work because he does not feel capable of it: he cannot keep a schedule because he has a hard time sleeping, has racing thoughts, and has mood swings that range from "really, really high" to "really, really down." (Id. at 29-30.) Khio does not believe he is able to work even when he is fully compliant with his medications. (Id. at 31.)

## C.    Vocational Expert's Hearing Testimony

Vocational Expert ("VE") James Radke answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 31-37.) The ALJ presented a hypothetical that inquired whether there were any jobs for a younger individual with no skilled work history who needed moderate restrictions as to attention and concentration, as to the ability to interact with the pubic, coworkers and peers, as to the ability to maintain socially appropriate behavior, and as to the ability to respond appropriately to changes in a work setting. (Id. at 32.) The person would also be limited to simple tasks of all exertion levels that can be learned in 30 days or less but with an infrequent need to make routine work place changes or to interact with others. (Id. at 32-33.) The VE answered that such an individual would be capable of working as a dishwasher, food preparer, and hand packer. (Id. at 33.) However, these jobs would not be

available to someone who missed work three times a month.  (Id. at 34.)  These jobs also would not be available to someone who is unable to remain on task for 90-95% of the day, including someone who becomes delusional three times a year or cannot understand, remember or carry out simple instructions.  (Id. at 35-36.)

## D.    The ALJ's Decision

The ALJ concluded that Khio is not disabled under § 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. § 1382c(3)(A).  (A.R. 43, 51.)  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 416.920(a)(4), which requires him to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).  If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, he must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence."  20 C.F.R. § 416.920(e).  The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work.  *Id.* at § 416.920 (f), (g).

Here, at steps one and two of the analysis, the ALJ determined that Khio has not engaged in substantial gainful activity since the application date of June 22,

2010, and that he suffers from the following severe impairments:  bipolar disorder and substance abuse disorder.  (A.R. 45.)  At step three, the ALJ declined to find that Khio has an impairment or combination of impairments that meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1.  (Id.)  At step four, the ALJ concluded that Khio "has the [RFC] to perform a full range of work at all exertional levels subject to the need for work that can be learned in 30 days or less, that is routine, stays the same day-to-day, involves only infrequent workplace changes, and does not require more than infrequent communication, team coordination or public interaction."  (Id. at 47.)  At step five, the ALJ found that Khio's RFC allows him to work as a dishwasher, food preparer, or hand packager.  (Id. at 51.)  Accordingly, the ALJ found that Khio is not under a disability as defined by the Social Security Act and denied his claim for benefits.  (Id.)

## Analysis

Khio argues that the ALJ's decision should be reversed because he committed the following errors: (1) failed to give controlling weight to his treating physician, Dr. Fraum; (2) attributed too much weight to the opinions of state agency doctors and various other non-treating source doctors; and (3) failed to properly assess his credibility.[3]  This court's role in disability cases is limited to reviewing whether the

---

[3]  Khio also argues that the ALJ erred in stating that it is "more probable than not" that he can perform some work.  (A.R. 49).  According to Khio, this statement is contrary to the "substantial evidence" standard and cites 42 U.S.C. § 405(g) as support.  This argument does not warrant more than a footnote here because Khio did not sufficiently develop his argument and his assertion is wrong for three reasons.  First, 42 U.S.C. § 405(g) provides the standard to be applied on judicial review.  Second, pursuant to 20 C.F.R. § 404.953(a), the ALJ was required to apply

ALJ's decision is supported by substantial evidence and is free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A. Dr. Fraum's Report

Dr. Fraum's RFC assessment deemed Khio incapable of functioning in a full-time, competitive work setting. (A.R. 644.) But the ALJ did not find her treatment notes supportive of restrictions of such severity. (Id. at 49.) He did not state the level of weight he afforded Dr. Fraum's assessment, but he clearly discredited her opinions and found her a "less reliable" source than other doctors of record. (Id.) Khio argues on appeal that the ALJ erred in failing to give Dr. Fraum's assessment controlling weight.

---

the "preponderance of the evidence" standard at the hearing level, which is a lower standard than the standard Khio believes the ALJ applied to his case. Third, the ALJ's one-time use of the phrase "more probable than not" within its eight-page opinion cannot be the basis for a conclusion that he applied an incorrect legal standard at the hearing stage.

The parties do not dispute that Dr. Fraum served as Khio's treating physician. As a "treating source," Dr. Fraum's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (citations omitted). An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates his reason for crediting or rejecting evidence of disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from considering it. He may still look to the opinion even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 416.927(d)(2)(i)-(ii), (d)(3), (d)(5).

The relevant issue here is whether the ALJ sufficiently articulated his reasons for affording little weight to Dr. Fraum's report. Although the court finds that the ALJ articulated numerous reasons for his determination, it nevertheless disagrees with enough of them to warrant a remand. Chief among the ALJ's reasons was the perceived disparity between Dr. Fraum's treatment notes and her

RFC assessment. To recap, in her six different treatment notes spanning roughly seven months, Dr. Fraum noted that Khio was at times healthy, that his mood and affect were appropriate, and that he reported sleeping better and exercising. (Id. at 556-58, 604-07.) But he also complained at times of severe depression, excessive irritability, and insomnia, and he lamented the loss of his friends, dreams, and career. (Id. at 557-58.) These complaints were often resolved with medication adjustments. In some contrast to these notations is Dr. Fraum's RFC assessment of August 3, 2011, in which she found that Khio has numerous debilitating anxiety triggers, including being around people, coping with supervisors, co-workers, and the general public, keeping up with productivity demands, dealing with family members, and having to leave his home environment. (Id. at 643.) She stated that Khio also has trouble with attention, task completion, and consistency, and that he is very moody. (Id. at 643-44.) She concluded that Khio's psychological conditions (depression, psychosis with paranoia, and mental confusion) prevent him from functioning in a competitive work environment and that he would be absent from work about three times a month. (Id. at 644.)

The ALJ found Dr. Fraum's conclusions unsupported by her treatment notes and thus he deemed Dr. Fraum a "less reliable source." (Id. at 49.) He noted that her medical progress notes "do not detail further information corresponding with the subjective symptoms she embraced, e.g., anxious around people, trouble with attention, task completion, anger outbursts." (Id.) He also criticized Dr. Fraum for failing to suggest hospitalization or outpatient therapy to address Khio's drinking.

(Id.)  Overall the ALJ found that Dr. Fraum's treatment notes "would not support restrictions of the severity that [she] endorsed."  (Id.)

At first glance the ALJ's decision appears to have merit.  But on closer examination some troubling assumptions and choices come to light.  True, there exists a disparity between Dr. Fraum's own treatment notes and her RFC assessment.  But, as Khio argues, Dr. Fraum's opinion "rested not only on her visits with Plaintiffs but also his prior visits with Dr. Kravets."  (R. 16, Pl's Mot. at 9.)  In other words, Khio argues that Dr. Fraum relied on the combination of her own treatment notes and Khio's prior treatment history with Dr. Kravets in reaching her medical conclusions.  Dr. Fraum did not specifically indicate in her RFC assessment whether she relied on her personal examinations coupled with Dr. Kravets's treatment notes.  However, Dr. Kravets's notes do in fact contain references to many of the restrictions Dr. Fraum endorses in her RFC assessment. The ALJ did not consider Dr. Kravets's notes when assessing the weight afforded to Dr. Fraum's opinions, explaining that Dr. Fraum "could not comment from personal experience about what she observed before that date, notwithstanding the fact that Dr. Kravets had seen the claimant regularly since November 2003."  (Id. at 48.) But, while denying Dr. Fraum the ability to use Dr. Kravets's notes to support her RFC assessment, the ALJ himself used Dr. Kravets's notes to highlight his perception that Dr. Fraum was an unreliable source, stating that Dr. Fraum "is less reliable than the numerous references to stability during intervals of compliance, including those by the claimant's own family.  Dr. Kravets similarly had charted a

November 16, 2007 note, observing that he had told the claimant to stay on his medications and indicating that he had made a counseling referral, which the claimant did not pursue." (Id. at 49.)

But by not considering Dr. Kravets's treatment notes (and the seven-year history they provide) and whether they may support Dr. Fraum's restrictions, the ALJ in effect penalized Khio for his long-standing doctor's retirement and replacement by Dr. Fraum. Khio had no control over his doctor's decision to retire and to transfer his care to another doctor. The fact of Dr. Kravets's retirement should not lead to Khio's forfeiture of the opportunity to have all of his treatment notes taken into consideration by Dr. Fraum. The ALJ's decision to exclude from Dr. Fraum's assessment the long-term treatment notes of her predecessor seems particularly unnecessary given that Drs. Kravets and Fraum were colleagues working out of the same medical facility. The ALJ ruled inconsistently when finding Dr. Fraum unable to avail herself of Dr. Kravets's notes in formulating the RFC assessment, but then using Dr. Kravets's notes himself to minimize the weight of Dr. Fraum's opinion. An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability. *See Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009). This picking and choosing necessitates a remand to allow the ALJ an opportunity to fully consider these treatment notes as they relate to Dr. Fraum's RFC assessment.

There are a number of other issues relating to Dr. Fraum's treatment notes and RFC assessment that warrant brief discussion. First is the ALJ's

determination that Dr. Fraum only spent 15 minutes per session with Khio because Dr. Kravets allocated that amount of time. The ALJ used this speculative 15-minute time period to weigh against Dr. Fraum's longevity as a treating source. (A.R. 48.) Although the ALJ's conjecture regarding the length of Dr. Fraum's sessions with Khio might be accurate, the court finds no support in the record for the ALJ's assumption.

Second, the ALJ never specifically stated how much weight he was affording Dr. Fraum's opinion other than to state that he found her a less reliable source. (Id. at 49.) On remand, the ALJ must clarify how much weight he is giving to Dr. Fraum's assessment in accordance with the factors enumerated in 20 C.F.R. § 416.927(d), including the length of the treating relationship and the frequency of the visits. *See also Larsen v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (finding that "[e]ven if the ALJ had articulated good reasons for rejecting [the treating source's] opinion, it still would have been necessary to determine what weight his opinion was due under the applicable regulations").

Third, the ALJ's decision focused heavily on the issue of alcohol consumption and substance abuse. In addition to listing "substance abuse" as a severe impairment at step two, the ALJ was critical of Dr. Fraum for suggesting a discontinuation of alcohol consumption, as opposed to advocating for inpatient or outpatient hospitalization. The court, however, finds the ALJ's focus on alcohol to be disproportionate to the actual medical record. Dr. Rudolph charted that Khio had no history of substance abuse. (A.R. 522.) Dr. Fraum's notations only contain

one reference to alcohol consumption. Dr. Kravets's notes contain no reference to alcohol or drugs. The Comprehensive Psychiatric Evaluation performed by Dr. Rahmen likewise noted no history of treatment for substance abuse. Although Dr. Rahmen also charted Khio's consumption of "several drink[s]" on the weekends and an occasional use of marijuana, there are no corresponding notations by him connecting the consumption of these substances to the severity of Khio's bipolar condition.[4]

## B.    Non-Treating Source Opinions

Khio argues that the ALJ improperly afforded substantial weight to the opinions of various state agency doctors, as well as consultative psychologist Dr. Rudolph and an attending psychiatrist, Dr. Tilkin. The court agrees that this issue is also one for the ALJ to reconsider upon remand, especially in light of the directive to re-examine Dr. Kravets's treatment notes alongside Dr. Fraum's treatment notes and RFC assessment. While an ALJ may give weight to the findings of consultative doctors, the ALJ must also be mindful not to "cherry-pick" evidence to support a denial of benefits. *See Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010); *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009). Here, the ALJ assigned substantial weight to the opinions of doctors—none of whom had a long-

---

[4] The Commissioner's attempt to argue the applicability of 42 U.S.C. § 423(d)(2)(C) (precluding disability benefits to claimants whose drug addiction or alcoholism is "a contributing factor material to the Commissioner's determination that the individual is disabled") is unavailing here because the Commissioner cannot advance a rationale upon which the ALJ himself did not rely. *See Campbell v. Astrue,* 627 F.3d 299, 307 (7th Cir. 2010) (stating that the *Chenery* doctrine prohibits the Commissioner from advancing grounds on which the ALJ did not rely).

term relationship with Khio—after cobbling together evidence plucked from the records of these various doctors. For instance, the ALJ was impressed with Dr. Rudolph's 2010 mental status examination (which lasted 35 minutes) finding that Khio has "adequate adaptive resources, implying the capacity to adjust to changes and deal with stress." (A.R. 50.) He was also impressed by Dr. Tilkin's July 2011 Consultation Report, in which Dr. Tilkin assigned Khio a GAF score of 60 and commented that he was "rapidly reintegrating" following stabilization of his Lithium dosage. (Id. at 50, 651.) But these "snapshot" selections of information from various medical records do not paint a clear picture of Khio's struggles. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (finding that "a snapshot of any single moment says little about [the claimant's] overall condition"). Also in the medical record are numerous examples of Khio's decompensations and hospitalizations (including two in 2011), his various medication adjustments, and his everyday challenges with mood swings, poor sleep, and lack of motivation. Take, for instance, the Comprehensive Psychiatric Evaluation performed by Dr. Rahmen upon Khio's admission to Elgin Hospital in March 2011, in which Dr. Rahmen assigned Khio a GAF score of 30 and noted that "[t]his is one of the many psychiatric hospitalization[s] for this Caucasian man who was evaluated for psychosis." (A.R. 633.) As stated by the Seventh Circuit, "[t]he very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Scott v. Astrue*, 647 F.3d

734, 740 (7th Cir. 2011). On remand, the ALJ will need to reassess the weight afforded to the various medical sources while remaining mindful that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008).

## C.     Credibility Determination

Next, Khio argues that the ALJ failed to make a proper credibility determination. The court agrees. When making a credibility determination, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence." 20 C.F.R. § 416.929(a). The ALJ must then "articulate specific reasons for discounting a claimant's testimony as being less than credible." *Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005).

A claimant challenging an ALJ's credibility assessment has a high hurdle to overcome because this court will not substitute its judgment for the ALJ's unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). But in this case, Khio has met this burden because the ALJ did not make a credibility assessment, or at least not one the court could find. The overall tone of the ALJ's decision, together with its ruling against disability, suggests that the ALJ

found Khio lacking in credibility, but the ALJ did not actually articulate his views on Khio's credibility. The ALJ did consider at step three Khio's activities of daily living, social functioning, and concentration, persistence and pace. (A.R. 46.) He commented on Khio's recent episodes of decompensation, noting that Khio's 2011 hospitalizations followed periods of medical non-compliance, but then found that Khio "likely has the adaptive capacity to take medications as prescribed, his motivation to do so notwithstanding." (Id.) Then, as part of his RFC analysis, the ALJ commented on Khio's testimony from the hearing, particularly as to his stated difficulty in adhering to a fixed schedule, the difficulty he has had remaining compliant with medications, and his reasons for rejecting outpatient therapy at a day hospital. (Id. at 47.) Finally, the ALJ stated that while he did not "minimize [Khio's] off-medication behavior," attending psychiatrists "consistently have observed that he reintegrates rapidly, once medications are restored." (Id. at 48.) These comments taken together suggest that the ALJ found Khio not credible, or only partially credible, but the court has no way of knowing this for sure. Accordingly, this court must remand the credibility determination for further elaboration. *See Getch*, 539 F.3d at 483 ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported.")

On remand the ALJ will want to carefully consider using repeated references to Khio's medical non-compliance as a potential reason for finding him not credible. As the Seventh Circuit has clarified, "ALJs assessing claimants with bipolar

disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference." *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011). This is so because people with mental illness often struggle with medication compliance due to the adverse side effects associated with these drugs. *See Martinez v. Astrue,* 630 F.3d 693, 697 (7th Cir. 2011) (noting that stopping medication is a common consequence of mania); *Spiva v. Astrue,* 628 F.3d 346, 351 (7th Cir. 2010) (noting that antidepressant drugs often have serious side effects that result in non-compliance).

## Conclusion

For the foregoing reasons, Khio's motion for summary judgment is granted to the extent it seeks a remand.

**ENTER:**


_____

**Young B. Kim**
**United States Magistrate Judge**